## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LANCE SCHULTZ,** | : | **CIVIL ACTION NO. 1:04-CV-1823** |
| **JESSICA STOUFFER, and** | : | |
| **ROBERT STOUFFER** | : | **(Judge Conner)** |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **KEVIN WILSON, ROBERT** | : | |
| **GEPHART, SHARON GELWICKS,** | : | |
| **CHARLES McGEEHAN,** | : | |
| **and FRATERNAL ORDER OF** | : | |
| **EAGLES 1562** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This civil rights case arises from police activity at the wedding reception of

plaintiffs Jessica Stouffer ("Jessica") and Robert Stouffer ("Robert").  Jessica and

Robert allege violations of 42 U.S.C. § 1981 and of their First and Fourteenth

Amendment rights.  Presently before the court are the motion for summary

judgment (Doc. 45) of defendant Pennsylvania State Trooper Robert Gebhart[1]

("Gebhart") and the motion for summary judgment (Doc. 50) of defendants Charles

---

[1]Plaintiffs' complaint identifies this defendant as Robert Ge*p*hart.
Defendant's motion for summary judgment instead refers to him as Ge*b*hart.  The
court will adopt the spelling used by Gebhart in his motion.

McGeehan ("McGeehan") and Fraternal Order of Eagles 1562 ("the Eagles").[2]  For

the reasons that follow, the motions will be granted.

I.   **Statement of Facts**[3]

This case presents a true matrimonial horror for plaintiff-bride Jessica

Stouffer.  Plaintiffs' claims arise from an altercation that erupted on August 17,

2002, at the wedding reception of Jessica and her newly wedded husband, Robert.

(Doc. 57 ¶ 3; Doc. 67 ¶ 1; Doc. 72 ¶ 3; Doc. 76 ¶ 1.)  Jessica and her mother had

reserved the Eagles Lodge in Gettysburg, Pennsylvania for the reception, which

approximately one hundred people attended.  (Doc. 57 ¶ 3; Doc. 67 ¶ 1; Doc. 72 ¶ 3;

Doc. 74, Ex. 2 at 9; Doc. 76 ¶ 1.)  The guest list included immediate family members,

extended relatives, parents' friends, and the couple's friends accompanied by

---

[2]On December 14, 2006, plaintiffs' counsel filed a letter with the court
indicating that "all matters pertaining to the defendant [sic] Wilson and Gelwick
[sic] have been settled to the satisfaction of these defendants and the plaintiff [sic]."
(Doc. 85.)  On December 26, plaintiffs' counsel filed a letter addressed to the Clerk
of Court requesting that the clerk "Dismiss, Discontinue, and End[] any and all
actions against the defendant Sharon Gelwicks."  (Doc. 87.)  The clerk terminated
Gelwicks as a defendant on the basis of this letter.  Plaintiffs' counsel filed no
similar documentation terminating Wilson as a defendant.  The court will construe
the letter of plaintiffs' counsel dated December 14, 2006 (Doc. 85) as a motion to
dismiss the claims against defendant Wilson with prejudice pursuant to Rule
41(a)(2) of the Federal Rules of Civil Procedure.  See FED. R. CIV. P. 41(a)(2)
(requiring an order of the court to dismiss an action).  The motion will be granted as
so construed.

[3]In accordance with the standard of review for a motion for summary
judgment, the court will present the facts in the light most favorable to the
plaintiffs, the nonmoving parties.  See infra Part II.

significant others.  (Doc. 74, Ex. 2 at 13-14, 16; Doc. 47, Ex. 6 at 3, 5; Doc. 74, Ex. 7 at 1-2; Doc. 74, Ex. 8 at 3.)

The Eagles are a local chapter of the Fraternal Order of Eagles, an international charitable and community organization.  (Doc. 74, Ex. 5 at 10.)  The Lodge holds a license to serve liquor from the Commonwealth of Pennsylvania.  (Id. at 11.)  The license listed Charles McGeehan, who was secretary of the Eagles and a trustee, as the manager of the Lodge bar at the time of the events of this case.  (Id.)  The Eagles do not hold the Lodge open to the general public, and only Eagles members may gain access to the bar or use Lodge facilities.  (Doc. 74, Ex. 3 at 13.)  The Lodge bar was open to both wedding guests and Eagles members on the night of the reception.   (Doc. 74, Ex. 2 at 11.)

The reception commenced at approximately 4:00 p.m.  (Id. at 9.)  McGeehan was present at the bar, as were a number of other individuals unassociated with the reception.  (Doc. 74, Ex. 3 at 8; Doc. 74, Ex. 5 at 11, 28.)  No manager was on duty. (Doc. 74, Ex. 5 at 12.)  McGeehan had not intended to supervise the bar area that evening, but in the absence of a manager, he asserted supervisory authority in his role as trustee.[4]  (Id. at 12-13.)  McGeehan believed that the reception would end by 8:00 p.m.  (Id. at 16.)  Apparently, the manager who had accepted Jessica's

_____

[4]Plaintiffs allege that McGeehan lacked the authority to act as supervisor. The record is unclear whether McGeehan was acting within the parameters of his trustee role or was attempting to assert authority he did not actually possess. (Compare Doc. 74, Ex. 3 at 19-20, with Doc. 74, Ex. 5 at 12-13.)  Nevertheless, the parties agree that McGeehan acted as if he had supervisory authority regardless of whether the organizational structure of the Eagles permitted him to do so.

reservation did not specify an ending time, and the reception continued until well after 8:00 p.m.[5]  (Doc. 74, Ex. 2 at 18-19; Doc. 74, Ex. 5 at 16.)

As the evening progressed, loud music with heavy bass began to play in the reception hall, and McGeehan purportedly referred to it as "nigger music."[6]  (Doc. 74, Ex. 3 at 21-22.)  He also received several complaints from others in the bar about the volume and asked the disc jockey to turn it down several times.  (Doc. 74, Ex. 2 at 15; Doc. 74, Ex. 5 at 26-27.)  Each time the disc jockey complied, and, ultimately, the bass component of the music was completely turned off.  (Doc. 74, Ex. 2 at 15-16.)   Between 9:30 and 10:00, Robert approached McGeehan to ask if the wedding guests could continue to use the reception hall past 10:00 p.m.  (Doc. 74, Ex. 1 at 17; Doc. 74, Ex. 5 at 17; Doc. 67 ¶ 2; Doc. 76 ¶ 2.)  McGeehan refused, and the situation escalated.  (Doc. 74, Ex. 1 at 17; Doc. 74, Ex. 5 at 17; Doc. 67 ¶ 3; Doc. 76 ¶ 3.)  Robert

---

[5]It is unclear whether the arrangements between the Eagles and the wedding party required that those attending the reception depart by a specified time. Jessica testified that the Jeremy Miller, the Lodge manager, told her that she and her guests could use the reception hall throughout the evening as long as they did not "have [Eagles staff members] cleaning up till [sic] 4:00 in the morning."  (Doc. 47, Ex. 2 at 18-19.)  McGeehan contradicted this, stating that Miller informed him that the reception was to end by 7:30 or 8:00 p.m.  (Doc. 47, Ex. 5 at 16.)

[6]McGeehan has testified that he never referred to the music in this manner (Doc. 47, Ex. 5, at 30.)  The court, however, must consider the facts in the light most favorable to the plaintiffs as the non-moving parties.

and McGeehan, both of whom had been consuming alcohol,[7] engaged in a heated

exchange about the length of the reception during which McGeehan purportedly

insulted Robert, referring to him as "little boy."[8]  (Doc. 74, Ex. 1 at 17.)  Robert then

turned away and moved toward the door.  (Id. at 19.)  As he did so, he was punched

in the back of the head.  (Id. at 19; Doc. 74, Ex. 3 at 7.)  He could not identify who hit

him, but he nevertheless "spun around with an open hand and hit somebody."

(Doc. 74, Ex. 1 at 20; accord Doc. 57 ¶ 8; Doc. 67 ¶ 4; Doc. 72 ¶ 8; Doc. 74, Ex. 3 at 7;

Doc. 76 ¶ 4.)  The individual was later identified as John Nichols ("Nichols"), a

Eagles member and friend of McGeehan who was also Robert's unseen assailant.

(Doc. 74, Ex. 3 at 7.)  Robert looked to see whom he had struck and was confronted

by McGeehan, Nichols, and a third individual.  (Doc. 74, Ex. 1 at 21.)  During the

ensuing confrontation an unidentified male voice cried, "Someone call the cops,"

---

[7]Robert testified at his deposition that he had consumed several drinks:

    Q.    What did you consume at the wedding reception?
    A.    About 3, 4, 5 beers and a shot.

(Doc. 74, Ex. 1 at 8.)  McGeehan also recalled having several beers:

    Q.    How much did you have to drink?
    A.    Oh.  I don't really know. I was . . . in the bar area from 7:30 till [sic]
          9:00. . . . [I]n one and a half hours, I don't believe I had more than three
          or four beers.

(Doc. 74, Ex. 5 at 44.)

[8]McGeehan testified that when he refused to allow the reception to continue,
Robert unleashed a volley of profanities upon him.  (Doc. 74, Ex. 5 at 17.)  Robert
did not recall doing so but stated that it was "possible" he used profanities and
raised his voice during the conversation.  (Doc. 74, Ex. 1 at 15, 19.)

and McGeehan did so amidst the ordeal.  (Doc. 74, Ex. 3 at 6; Doc. 74, Ex. 5 at 18.)

Other patrons in the bar were eventually able to pacify the men, but not before

Robert inflicted a noticeable facial injury on Nichols.  (Doc. 57 ¶ 8; Doc. 67 ¶¶ 4, 15;

Doc. 72 ¶ 8;  Doc. 74, Ex. 3 at 8-9; Doc. 76 ¶¶ 4, 15.)

     Local police quickly responded to McGeehan's call, and tumult ensued.

According to plaintiffs, officers entered the reception with firearms drawn, and at

least one wore a gas mask.  (Doc. 74, Ex. 2 at 27-28.)  "[P]eople [were] yelling and

screaming," (Doc. 74, Ex. 3 at 13), and the scene was "just a bunch of mayhem" with

"[e]verybody . . . trying to figure out what was going on," (Doc. 74, Ex. 10 at 8-9; <u>see</u>

<u>also</u> Doc 74, Ex. 2 at 111-12).  One witness recounted that "a groomsman[] fl[ew]"

across the gift table," but the witness could not identify the source of the

groomsman's momentum.  (Doc. 74, Ex. 8 at 8-9.)  Another recalled "there [being] a

lot of confusion," (Doc. 74, Ex. 9 at 6), with "people coming in . . . from everywhere,"

(<u>id.</u>).

     Trooper Gebhart, who was in plain clothes, entered the scene after local

police had arrived.  (<u>Cf.</u> Doc. 67 ¶ 11; Doc. 76 ¶ 11.)  Gebhart was directed into the

reception hall by a bartender and another responding officer.  (Doc. 67

¶¶ 11-14; Doc. 76 ¶¶ 11-14.)  En route to the hall, he encountered McGeehan and the

injured Nichols.  (Doc. 67 ¶ 15; Doc. 76 ¶ 15.)  The pair informed him of the evening's

events and stated that the wedding guests had stayed beyond the period for which

the reception hall was reserved.  (Doc. 67 ¶ 17-19; Doc. 76 ¶ 17-19.)  Gebhart walked

into the reception hall, turned on the lights to secure everyone's attention and

6

allegedly barked:  "[Y]ou need to get the fuck out."  (Doc. 67 ¶ 20; Doc. 74, Ex. 1 at 32; Doc. 74, Ex. 2 at 25; Doc. 74, Ex. 11 at 95, 109; Doc. 76 ¶ 20.)  Subsequently, Robert overheard Gebhart mutter:  "Where's the groom[?] I want a piece of him."[9] (Doc. 74, Ex. 1 at 32.)  Gebhart approached Robert, who responded:  "[W]ho the hell are you?"  (Id. at 32-33.)  Something then distracted Gebhart because he then moved away from Robert without further confrontation.  (Id. at 33-34.)

The police restored order, and the wedding celebrants disbanded.  By the end of the evening, Robert was handcuffed and arrested, but not by Gebhart.  (Id. at 34.)  Police released Robert later that evening without transporting him to the police station.  (Id.)  He was convicted of disorderly conduct and simple assault before a district justice, and his summary appeal to the Pennsylvania Court of Common Pleas failed.  (Doc. 57 ¶ 14; Doc. 72 ¶ 14; Doc. 74, Ex. 1 at 35-37.)  The police handcuffed at least three other people during the ordeal at the Eagles Lodge.  (Doc.

---

[9]Robert's father-in-law, Rick Schultz, recalled Gebhart making a less pointed version of the statement.  He remembers Gebhart asking:  "[W]here's the guy that started all of this?  I want a piece of him."  Schultz believed Gebhart "was just more or less talking to himself, because he didn't look at me when he said it.  He was just saying it as he walked in front of me."  (Doc. 74, Ex. 4 at 17.)

74, Ex. 6 at 15-16, 24; Doc. 74, Ex. 11 at 53, 57) Two of them were placed under

arrest, including plaintiff Lance Schultz ("Lance").[10]  (Doc. 74, Ex. 11 at 57).

Jessica and Robert filed a complaint in the instant case on August 17, 2004.

Plaintiffs aver that defendants' conduct throughout the evening was motivated by

racial animus for their wedding guests, some of whom are African American.  (Id. at

80.)  None of the plaintiffs or individual defendants are members of a racial

minority.  (Doc. 57 ¶¶ 1-2, 4; Doc. 72 ¶¶ 1-2, 4.)  Jessica never discussed the racial

composition of the guest list with the Eagles when reserving the Lodge, and both

McGeehan and Gebhart testified that they did not specifically notice that any of the

wedding guests were African American.  (Doc. 57 ¶ 3; Doc. 58, Ex. E at 32; Doc. 72 ¶

3; Doc. 74, Ex. 5 at 34.)  Plaintiffs nevertheless contend that defendants McGeehan

and the Eagles violated 42 U.S.C. § 1981 by requesting police assistance at the

Lodge.  They claim that McGeehan, Gebhart, and the Eagles violated their First

---

[10]Lance was arrested after an exchange with police about the treatment of
Jessica, his sister.  The police were arresting one of the guests when Jessica
approached them to ask why they had entered the reception.  (Doc. 74, Ex. 11 at 47.)
An officer rebuffed her advance by telling her to calm down and by "hit[ting] her in
the chest to make her back[]up."  (Id. at 48.)  The strength of the officer's push
made her hunch over.  (Id. at 52.)  Lance, who was seated nearby, told the officer
"not to put his hands on [Jessica,] and so [the officer] took his attention to [Lance]."
(Id. at 51)  The officer told Lance not to get involved or he would be arrested.  (Id.)
Lance responded:  "[F]ine, [but] don't put your hands on my sister."  (Id.)  Lance
advanced toward the officer, who arrested him.  (Id. at 53.)  Another officer
approached and aided the first in handcuffing Lance.  (Id. at 57.)  Lance stated that
the two officers then "picked me up and slammed me down and [the first officer]
had the back of my neck so I couldn't turn my face at all.  So when I hit [the floor, I]
hit face first."  (Id. at 57-58)  Three of his teeth were knocked out as a result of the
blow.  (Id. at 60.)  Lance is not party to any claims affected by the pending motions.

Amendment right of association when defendants dispersed the wedding celebration due to racial motivation.[11]   Lance and Jessica also brought claims for excessive force and malicious prosecution under the Fourth and Fourteenth Amendments.  These claims have been settled or voluntarily dismissed and are not subject to the pending motions.  (See Docs. 61, 85.)  The parties have thoroughly briefed the remaining issues, which are now ripe for decision.

## II.   **Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places the burden on the non-moving party to come forth with "affirmative evidence,

---

[11]Plaintiffs allege an additional civil conspiracy claim against McGeehan in connection with the deprivation of their right of association.  (Doc. 71 at 10-12.)  They also contend that the Eagles are liable for discrimination under the Commerce Clause of Article I, Section 8 of the United States Constitution.  (Id. at 15-16.)  Plaintiffs' complaint does not raise these claims, and plaintiffs have asserted them for the first time in their summary judgment briefs.

A party may not utilize a summary judgment motion as a vehicle to raise claims not supported by the pleadings.  Tome v. Harley Davidson Motor Co., No. 1:CV-06-2155, 2007 WL 3125090, at *7 (M.D. Pa. Oct. 24, 2007) ("Claims not alleged in a complaint may not be raised for the first time in opposition to a motion for summary judgment.").  Any attempt to do so will result in the newly asserted claims being deemed waived.  See Shingara v. Skiles, No. 1:04-CV-0621, 2007 WL 210800, at *3 n.5 (M.D. Pa. Jan. 24, 2007) (holding that claims raised in the first instance at the summary judgment phase are waived); Protocol Elecs., Inc. v. Transolutions, Inc., No. Civ. 03-4162, 2005 WL 1106132, at *5 (D.N.J. Apr. 29, 2005) ("[I]t is impermissible, without leave of court, to raise new claims for the first time on summary judgment."); see also Krouse v. Amer. Sterilizer Co., 126 F.3d 494, 499 (3d Cir. 1997).  Plaintiffs' failure to raise the conspiracy and Commerce Clause claims in their complaint therefore results in a waiver of those claims, and the court will not consider them further.

beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see also</u> FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III.   <u>Discussion</u>

Plaintiffs Robert and Jessica allege race discrimination by McGeehan and the Eagles in violation of 42 U.S.C. § 1981. They also allege that Gebhart, McGeehan, and the Eagles violated their First Amendment right to association by entering the wedding reception and dispersing the guests.

### A.   <u>Race Discrimination Claim Pursuant to 42 U.S.C. § 1981</u>

Jessica and Robert, who are Caucasian, claim that McGeehan, who is also Caucasian, and the Eagles committed racial discrimination against them in violation of 42 U.S.C. § 1981. They argue that defendants knew that several of their wedding guests were African American. McGeehan, as secretary and trustee for the Eagles, allegedly called the police because of animus toward those guests.

Section 1981 was enacted to "abolish all the remaining badges and vestiges of the slavery system." <u>Mahone v. Waddle</u>, 564 F.2d 1018, 1030 (3d Cir. 1977). It states, in pertinent part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The statute creates a cause of action against private entities that engage in discriminatory acts.  No state action is required.  See 42 U.S.C. § 1981(c); Brown v. Philip Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001).  Absent direct evidence of discrimination, "[c]laims brought pursuant to Section[] 1981 . . . follow the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)."  Shipley v. B&F Towing Co., No. Civ.A 04-1530, 2006 WL 1652787, at *2 (D. Del. June 13, 2006); accord Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 385 (3d Cir. 1999) (holding that § 1981 cases are analyzed under burden-shifting McDonnell Douglas framework); Ford v. Veterinary Ctrs. of Am., Inc., No. 00-4604, 2001 WL 1152948, at *3 (E.D. Pa. Sept. 14, 2001).  To establish a prima facie case under § 1981, a plaintiff must demonstrate "(1) that he belongs to a [protected racial group]; (2) 'an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in' § 1981, including the right to make and enforce contracts."  Pryor v. Nat'l Coll. Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002) (quoting Brown, 250 F.3d at 797); see also, Shipley, 2006 WL 1652787, at *2.

A plaintiff need not be a member of a racial minority to establish a prima facie case.  Caucasian plaintiffs subjected to reverse discrimination may invoke

11

§ 1981 against defendants who engage in differential treatment of the plaintiffs on the basis of race.  See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 286-87 (1976); Hicks v. ABT Assocs., 572 F.2d 960, 967 (3d Cir. 1978) ("[S]ection [1981] applies on the same terms to discrimination against . . . whites as it does to discrimination against . . . racial and ethnic minorities."); Wood v. Rendell, No. Civ.A. 94-1489, 1995 WL 676418, at *3 n.7 (E.D. Pa. Nov. 3, 1995).  Similarly, "a 'white person who is injured as a result of his or her efforts to defend the rights of non-whites' can bring a claim under § 1981" for retaliation.  Altieri v. Pa. State Police, No. Civ.A. 97-CV-5495, 2000 WL 427272, at *14 (E.D. Pa. Apr. 19, 2000) (quoting Alder v. Columbia Historical Soc'y, 690 F. Supp. 9, 15 (D.D.C. 1988)); accord Liotta v. Nat'l Forge Co., 629 F.2d 903, 906-07 (3d Cir. 1980) (holding that defendant's retaliation against plaintiff for supporting the rights of defendant's African American employees could support liability under § 1981).  If a § 1981 plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the defendant's conduct.  See Shipley, 2006 WL 1652787, at *2; Nichols v. Bennett Detective & Protective Agency, No. Civ.A. 05-55, 2006 WL 1530223, at *4 (D. Del. May 31, 2006).  The burden then shifts once again to the plaintiff to demonstrate that the defendant's articulated nondiscriminatory reason was a pretext for discriminatory conduct.  See Shipley, 2006 WL 1652787, at *2; Nichols, 2006 WL 1530223, at *4.

    In the instant case, Robert and Jessica allege that they fall within the protection of § 1981 because defendants discriminated against them for associating

with African Americans.  They aver that McGeehan, acting on behalf of the Eagles, called the police to disperse their guests out of racial animus, thereby interfering with their contract for rental of the Lodge reception hall.  They suggest that McGeehan's derogatory description of the music played at the reception demonstrates that he acted with discriminatory intent, giving rise to liability under § 1981.

The court finds these allegations insufficient to support an inference of intentional race discrimination by McGeehan and the Eagles.  McGeehan's alleged reference to "nigger music" is the only evidence plaintiffs proffer to support their claim that McGeehan acted with racial malice.  The court does not overlook the contemptible nature of this alleged reference.  Indeed, the racial slur attributed to McGeehan is "highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination." McGinest v. GTE Svc. Corp., 360 F.3d 1103, 1116 (9th Cir. 2004); cf. Moore v. City of Phila., 461 F.3d 331, 344-45 (3d Cir. 2006) (describing language of the type used by McGeehan as a "racially charged epithet[]"); Boyer v. Johnson Matthey, Inc., No. Civ.A. 02-CV-8382, 2005 WL 35893, at *15 (E.D. Pa. Jan. 6, 2005).  However, in the factual context of the instant case, it was an isolated derogation uttered to companions.  (See supra note 6.)  McGeehan never directed it at either plaintiffs or their African American wedding guests.  (See id.)  None of the plaintiffs personally heard the offensive language.  (See id.)  During the argument between McGeehan and Robert, McGeehan allegedly delivered several insults

against Robert, including calling him "little boy;"[12] yet even amidst this hostile exchange, McGeehan never invoked a racial epithet against Robert or his wedding guests.  These facts suggest that McGeehan was quite agitated about the circumstances of plaintiffs' wedding reception, but they do not demonstrate that he acted with racial animus.

To the contrary, the evidence indicates that McGeehan's conduct which forms the gravamen of plaintiff's § 1981 claims—calling the police—was undertaken to prevent a potentially dangerous bar brawl.  He believed the reception would end by approximately 8:00 p.m., but it was still going strong at 9:30 p.m.  Robert, having had several drinks, quarreled with McGeehan about the length of the reception.  He turned to walked away and was struck from behind.  Rather than identifying the assailant, Robert immediately turned around and struck Nichols without determining whom he was about to hit.  Several bar patrons were needed to quell the altercation, and McGeehan called the police amidst this fray.  The court holds

---

[12]The term "boy" may, in some contexts, be employed as a racial epithet demeaning to African Americans.  See Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (rejecting notion that the term "boy" carries only a benign connotation); Smith v. ABF Freight Systems, Inc., No. Civ.A. 1:04-CV-2231, 2007 WL 3231969, at *8 (M.D.Pa. Oct. 29, 2007).  Nevertheless, it does not always imply racial animus.  See Ash, 546 U.S. at 456 ("The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage.") In the case sub judice, McGeehan used the term "boy" in conjunction with the adjective "little."  The phrase "little boy" indicates that he intended it as an affront to Robert's manhood rather than as a racially motivated insult.  Further, plaintiffs have produced no contradictory evidence to suggest that McGeehan intended to invoke the term's racial overtones rather than pejorative implications of youth and immaturity.

that, in light of Robert's admitted conduct, no reasonable jury could find that

McGeehan called the police for discriminatory reasons.  To the contrary, McGeehan

did so to control a situation that threatened harm to himself, to the bar patrons, and

to the wedding guests.  He acted simply to prevent an altercation from escalating

into a dangerous and violent melee.  Therefore, plaintiffs' claim under § 1981

against McGeehan and the Eagles must fail.

### B.    First Amendment Claims Pursuant to 42 U.S.C. § 1983

Section 1983 offers private citizens a means to redress violations of federal

law committed by state officials.  See 42 U.S.C. § 1983.  The statute provides, in

pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

Id.  Section 1983 is not a source of substantive rights and instead provides a method

for vindicating rights secured elsewhere in federal law.  Gonzaga Univ. v. Doe, 536

U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  A § 1983

plaintiff must demonstrate that the defendant, while acting under the color of state

law, deprived the plaintiff of a federal constitutional or statutory right.  Kaucher v.

County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).

Plaintiffs allege that McGeehan, the Eagles, and Gebhart are liable under § 1983 for violation of their First Amendment right of association.  McGeehan and the Eagles argue that their actions were not performed under the color of state law and therefore cannot give rise to § 1983 liability.  Gebhart, as a police officer responding to a dispatch call, was clearly acting under the color of state law; however, he contends that his action did not violate plaintiff's First Amendment rights.

### 1.   <u>Defendants McGeehan and Eagles</u>

The purpose of the requirement that a § 1983 defendant act under the "color of state law" is to ensure that civil rights protections are applied only against government actors, who can be held liable for infringing them.  This requirement prevents a private entity from becoming subject to § 1983 liability unless it engages in conduct that may be fairly attributed to the state.  <u>Mauro v. Beil</u>, 213 F. App'x 131, 132 (3d Cir. 2007).  The "color of state law" requirement under § 1983 is coextensive with the state action doctrine of the Fourteenth Amendment.  <u>See Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 935 (1982); <u>Crissman v. Dover Downs Entm't, Inc.</u>, 289 F.3d 231, 233 n.2 (3d Cir. 2002); <u>Cmty Med. Ctr. v. Emergency Med. Svcs.</u>, 717 F.2d 878, 879 n.3 (3d Cir. 1983).  Therefore, if a party engages in state action for Fourteenth Amendment purposes, it also acts under color of state law as defined by § 1983.

Several approaches exist to the state action analysis, including the symbiotic relationship test and the close nexus test.  Under the symbiotic relationship test, a private entity's conduct will constitute state action if "the state [is] implicated in the conduct complained of."  Crissman, 289 F.3d at 240; see also Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961) (holding that private party becomes a state actor when the state "has so far insinuated itself into a position of interdependence" with the entity that the entity's conduct is no longer "purely private").  The private entity's conduct must bear the imprimatur of the state to such a degree that the relationship between the two is one of thorough interdependence.  See Crissman, 289 F.3d at 240-41 ("[I]f a "symbiotic" relationship . . . exist[s], then, by virtue of the close involvement of the state and interdependence of the actors in the association formed and the challenged activity, the conduct complained of is in fact "fairly attributable" to the state."); see also Burton, 365 U.S. at 862.  In contrast, the close nexus test analyzes the impetus behind the private entity's conduct.  A private entity will be deemed a state actor if the state is responsible for the party's conduct.  See Jackson v. Metro. Edison Co., 419 U.S. 345, 453 (1974) (holding that liability under the close nexus test requires that the private entity's action be "fairly treated as that of the State itself"); cf. Crissman, 289 F.3d at 246 (determining that private

entity could not be liable under the close nexus test because the plaintiffs failed to demonstrate that the state was the source of their alleged injury).[13]

Application of the symbiotic relationship and close nexus tests "frequently admits of no easy answer"; however, a number of bright lines have emerged from these two analyses. Jackson, 419 U.S. at 350. State licensing presents such an area of clarity. Merely holding a state license to engage in a regulated activity does not render a private entity a state actor absent further state activity. See Moose Lodge No. 107 v. Irvis, 407 U.S. 171-72 (1972) (holding that private club does not become a state actor simply because it holds a state-issued licensed to serve alcohol); Crissman, 289 F.3d at 243 ("[S]tate licensing [is] not enough to make a private entity a state actor."); Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, (3d Cir. 1979). Hence, a private club that does not hold itself open to the general public does not act under color of state law solely because it holds a state-issued liquor license. See Moose Lodge, 407 U.S. at 171-72, 74.

In the instant case, defendants Eagles and McGeehan fall squarely within the protection of Moose Lodge. The Eagles are a local chapter of an international

---

[13]The discussion of the state action doctrine in plaintiffs' brief (Doc. 71) contains over a page of text that is identical to the language appearing in Sinclair v. Turning Point of Lehigh County, No. Civ.A. 93-6821, 1995 WL 20812, at *3 (E.D. Pa. Jan. 13, 1995.) Nowhere in the brief has plaintiffs' counsel cited Sinclair, nor is the verbatim material formatted as a quotation. The court notes that "it is certainly misleading . . . to quote at length a judicial opinion (or, for that matter, any source) without clear attribution." United States v. Lavanture, 74 F. App'x 221, 224 n.3 (3d Cir. 2003). Such conduct often "ill-represents [the] client's interests," and the court wishes to join the United States Court of Appeals for the Third Circuit in expressing a "strong disfavor of the practice." Id.

fraternal organization and require membership to use Lodge facilities.  The general public cannot enter the Lodge or access the bar without first becoming a member of the Eagles.  Further, the record contains no evidence that the Commonwealth of Pennsylvania participates in the affairs of McGeehan or the Eagles in any way other than authorizing them to sell alcohol to their members.  Without a greater showing of state action, the plaintiffs cannot demonstrating that McGeehan or the Eagles are state actors under either the symbiotic relationship test or the close nexus test. Accordingly, McGeehan and the Eagles cannot be subject to § 1983 liability for the alleged First Amendment violations.

### 2.   Defendant Gebhart

Defendant Gebhart, an on-duty police officer called to an emergency, was clearly acting under the color of state law when he dispersed the wedding reception.  Nevertheless, he claims that his actions did not violate Robert and Jessica's First Amendment right of association.  The First Amendment protects two types of association: expressive association and intimate association.  Plaintiffs have not specified which association right Gebhart allegedly violated; therefore, the court will analyze plaintiffs' claim under both doctrines.

Expressive association protects the ability of individuals to gather for the purpose of pursuing "political, social, economic, educational, religious, and cultural ends."  Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984); see also Pi Lambda Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 443 (3d Cir. 2000).  To invoke the right, a group "must engage in some form of expression, whether it be public or

private" beyond that which is "merely incidental" to the plaintiff's everyday activity. Boy Scouts of Am. v. Dale, 530 U.S. 640, 648, 655 (2000); Pi Lambda, 229 F.3d at 443-44. Mere social relationships receive no protection, and plaintiffs asserting the right of expressive association must be involved in "expressive activity that could be impaired in order to be entitled to protection." Dale, 530 U.S. at 655. Activity that commonly implicates the right includes that which fosters moral development, religious expression, political discourse, community engagement, cultural commentary, and similar civic purposes. Compare City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989) (declaring that social association with strangers at a dance club implicates no right of association), and Pi Lambda, 229 F.3d at 444-45 (holding that college fraternity lacked protection of freedom of association because it engaged in merely social activities), with Dale, 530 U.S. at 649-650 (finding that organization dedicated to instilling values in young people engages in protected expressive activity). The plaintiff's activity need not be primarily expressive, but it must contain an expressive component above the *de minimis* expression inherent in any human activity. See Pi Lambda, 229 F.3d at 443-45.

In the instant case, Jessica and Robert argue that they engaged in expressive association at their wedding reception by entertaining several African American wedding guests. They assert that this conduct constitutes expression beyond the *de minimis* level. Gebhart allegedly acted with racial animus against this expression. McGeehan's derogatory reference to the music at the reception allegedly acts as the source of this animus, which he transferred to Gebhart upon the latter's arrival at

the Lodge.  (See Doc 75 at 5-6.)  Gebhart then allegedly disbursed the celebration on the basis of the race of some of the wedding guests.  (See id. at 5-6.)  Plaintiffs' assert that these acts violated their right of expressive association to celebrate their nuptials with their African American guests.

The record cannot support this claim.  Plaintiffs' planning and celebration of their wedding are examples of precisely the type of *de minimis* activities excluded from the protection of expressive association.  Plaintiffs acted wholly for the benefit of themselves and their guests.  They lacked any heightened element of political, cultural, or civic expression beyond that contained in ordinary, everyday human activity.  The planning of a wedding celebration simply does not implicate the type of cultural, educational, social, or economic expression that is necessary to support an association claim.

Further, the evidence fails to indicate that Gebhart acted out of racial animus.  In fact, Robert testified that he never heard Gebhart use racial language of any sort. (Doc. 74, Ex. 1 at 46.)  Plaintiffs' allegation that McGeehan's alleged racial animus transferred to Gebhart is wholly unsubstantiated by the record.  Gebhart never uttered a racial comment, nor is he alleged to have treated African American wedding guests differently from Caucasian individuals.  The mere temporal proximity between McGeehan's derogatory remark and his conversation with Gebhart outside the reception hall fails to demonstrate either that Gebhart knew of McGeehan's comment or that he was motivated by any purpose other than the restoration of order to the reception hall.  The record lacks a scintilla of evidence

21

from which racial animus can be inferred on the part of Gebhart. As such, plaintiffs' allegations of racial motivation for Gebhart's conduct are little more than whispers of racial discrimination in what is otherwise a tempest of contrary evidence. The plaintiffs have failed to demonstrate either the existence or violation of a right to expressive association.

Failure to establish an expressive association claim does not prevent plaintiffs from seeking recovery under an intimate association theory. The right of intimate association protects the closest and most interdependent of human relationships against state interference. See Pi Lambda, 229 F.3d at 441-42. It protects relationships that "'by their nature involve deep attachments and commitments to the necessarily few other individuals with whom one shares . . . distinctively personal aspects of one's life.'" Id. (quoting Roberts, 468 U.S. at 619-20); see also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 545 (1987). Family bonds represent the quintessential form of intimate association, but the right may also extend to other relationships based on the "'size, purpose, policies, selectivity, [and] congeniality'" of the group among which the relationships occur. Id. at 442 (quoting Roberts, 468 U.S. at 620). There is no specified size beyond which a group ceases to be intimate. Nevertheless, intimacy requires a small, tightly knit group, and gatherings of as few as twenty individuals have been denied intimate association status when they feature only social acquaintanceships. See Duarte, 481 U.S. at 546-47 (holding that local rotary clubs, which varied in size from twenty to nine hundred members, were not protected intimate associations);

22

Pi Lambda, 229 F.3d at 442 (holding that fraternity of twenty-two individuals was too large to qualify as an intimate association, in part because it had sometimes had as many as eighty active members).  Plaintiffs allege that Gebhart violated this right out of racial animus.

In the case *sub judice*, the court finds that Gebhart's actions did not violate Robert and Jessica's right to intimate association.  Approximately one hundred people attended the reception.  The size of this group alone suggests that the plaintiffs lack the type of close, devoted relationships with all their guests required for an intimate association claim.  A review of the guest list confirms this.  Although the plaintiffs' close friends and family members attended the reception, also present were many individuals with whom they had only an attenuated relationship. Jessica testified that two of her "mom's friends" were present at the reception, and one of the wedding guests stated that he knew Jessica and Robert only "through [his] girlfriend."  (Doc. 74, Ex. 2 at 16; Doc. 74, Ex. 7 at 1-2).  Another guest stated that she attended the reception "with . . . Jess's cousin" rather than because of a direct connection to the marital couple.  (Doc. 74, Ex. 10 at 3-4.)  These types of gossamer connections between individuals do not "involve [the] deep attachments and commitments [between] individuals" necessary to an intimate association claim.  Roberts, 468 U.S. at 619-20.  Additionally, as discussed above, the record fails to demonstrate that Gebhart acted in furtherance of racially motivated purposes.

Plaintiffs' First Amendment freedom of association claim must fail under either an

expressive association or intimate association theory.[14]

---

[14]The court notes that assuming, *arguendo*, Gebhart violated plaintiffs' First Amendment rights, qualified immunity would protect him from suit. Qualified immunity protects a law enforcement officer who has violated a plaintiff's rights if the rights were not "clearly established" when the officer acted. The officer will be amenable to suit only if "it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Curley v. Klem, 499 F.3d 199, 207 (3d. Cir. 2007) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). No liability will attach if a reasonable police officer under the circumstances could have believed that the challenged conduct was lawful. Springer v. Henry, 435 F.3d 268, 280 (3d Cir. 2006) (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991) ("[T]he court should ask whether the [official] acted reasonably under settled law in the circumstances." (second alteration in original)).

In the present case, the scene to which Gebhart responded was chaotic by all accounts. (See, e.g., Doc. 74, Ex. 2 at 111-12.) The bar fight between Robert and Nichols had occurred by the time Gebhart arrived the Eagles Lodge, and Gebhart's dispatcher had informed him that a physical altercation had taken place. Gebhart observed Nichols with an obvious injury to the face when he arrived. Several of the weddings guests and bar patrons had been drinking. Other officers were already working to restore order to the scene, and one person fell over the gift table during this process. Police also had to arrest or restrain several others.

Gebhart's alleged participation in the response consisted of turning on the lights and profanely directing the guests to leave the premises. He also moved toward Robert, who swore at him, but Gebhart then became distracted and did not pursue Robert. The court concludes that Gebhart's minimal participation in an otherwise unruly scene was not unreasonable under the circumstances. To the contrary, a reasonable officer would have been prepared for a potentially violent confrontation at the Lodge and would have believed that he or she was within the parameters of the law by acting as Gebhart did. Gebhart's use of profanity does not detract from the reasonableness of his response under the circumstances. Cf. Todd v. Kyler, No. 1:CV-05-1994, 2007 WL 61062, at *4 (M.D. Pa. Jan. 5, 2007) ("Mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations."). Therefore, the court finds that assuming, *arguendo*, that Gebhart violated the plaintiffs' constitutional rights, those rights were not clearly established at the time he acted. Accordingly, application of qualified immunity provides an appropriate alternative disposition for the claims against Gebhart.

**IV.**   <u>**Conclusion**</u>

Defendants' actions at Jessica and Robert's wedding reception violated neither § 1981 nor the First Amendment.  The motions for summary judgment (Docs. 45, 50) must therefore be granted.

An appropriate order shall issue.

<u>  S/ Christopher C. Conner  </u>
CHRISTOPHER C. CONNER
United States District Judge

Dated:        December 4, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LANCE SCHULTZ,** | : | **CIVIL ACTION NO. 1:04-CV-1823** |
| **JESSICA STOUFFER, and** | : | |
| **ROBERT STOUFFER** | : | **(Judge Conner)** |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **KEVIN WILSON, ROBERT** | : | |
| **GEPHART, SHARON GELWICKS,** | : | |
| **CHARLES McGEEHAN,** | : | |
| **and FRATERNAL ORDER OF** | : | |
| **EAGLES 1562** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 4th day of December, 2007, upon consideration of the

motions for summary judgment (Docs. 45, 50) and the letter filed by plaintiffs'

counsel (Doc. 85), and for the reasons discussed in the accompanying

memorandum, it is hereby ORDERED that:

1.    The motion for summary judgment of defendant Robert Gebhart (Doc. 45) is GRANTED.

2.    The motion for summary judgment of defendants Charles McGeehan and Fraternal Order of Eagles 1562 (Doc. 50) is GRANTED.

3.    The letter filed by plaintiffs' counsel is CONSTRUED as a motion to dismiss the claims against defendant Kevin Wilson with prejudice pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure. The motion is GRANTED as so construed.

4.      The Clerk of Court is directed to enter JUDGMENT in favor of defendants and against plaintiffs on all claims.

5.      The Clerk of Court is directed to CLOSE this case.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge